UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SERVICE EMPLOYEES INTERNATIONAL
UNION NATIONAL INDUSTRY PENSION
FUND, *et al.*,

    *Plaintiffs*,

v.

PARKWAY HEALTHCARE, LLC,

    *Defendant.*

Civil Action No. 17-cv-1676 (DLF)

**MEMORANDUM OPINION**

The Service Employees International Union National Industry Pension Fund (the Fund) and its Trustees bring this action under the Employee Retirement Income Security Act of 1974 (ERISA), §§ 1132(a)(3), (d)(1), (g)(2), 1145, and the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185(a), to collect unpaid contributions, interest, liquidated damages, audit testing fees, attorneys' fees, and costs from defendant Parkway Healthcare, LLC. Before the Court is the plaintiffs' Motion for Summary Judgment, Dkt. 11, under Rule 56 of the Federal Rules of Civil Procedure.

**I. BACKGROUND**

The parties dispute nearly every fact in this case. *Compare* Pls.' Statement of Facts, Dkt. 11-2, *with* Def.'s Resp. to Pls.' Statement of Facts, Dkt. 15-1. Thus, the Court must examine each party's submissions to decide whether any of these disputes are "genuine" and warrant a trial. *See* Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

### A. Contractual History

According to the plaintiffs, the Fund qualifies as an "employee pension benefit plan" and a "multiemployer plan" under ERISA. *See* 29 U.S.C. §§ 1002(2)–(3), 1002(37)(A). Three legal documents govern the Fund's relationship with the defendant: a Collective Bargaining Agreement requiring certain contributions, a Trust Agreement establishing the Fund, and a Collection Policy adopted by the Trustees. *See* Smith Decl. ¶¶ 6–7, 9–10, Dkt. 11-3; *see also* Pls.' Mot. for Summ. J. Ex. 1, Dkt. 11-5 (Collective Bargaining Agreement); Pls.' Mot. for Summ. J. Ex. 2, Dkt. 11-6 (Trust Agreement); Pls.' Mot. for Summ. J. Ex. 3, Dkt. 11-7 (Collection Policy).

Since April 1, 2010, the Collective Bargaining Agreement has required the defendant to make contributions to the Fund on behalf of certain categories of employees, including certified nursing assistants, dietary and housekeeping workers, and recreational aides. Smith Decl. ¶¶ 6–7; *see also* Pls.' Mot. Summ. J. Ex. 1. In the Collective Bargaining Agreement, the defendant also "agree[d] to be bound by the provisions of the [Trust Agreement] establishing the Fund . . . and by all resolutions and rules adopted by the Trustees pursuant to the powers delegated to them by the Agreement, including collection policies." Smith Decl. ¶ 9 (quoting Pls.' Mot. for Summ. J. Ex. 1, Art. 25.4). The Trustees adopted a Collection Policy that requires employers to submit contributions each month along with a remittance report detailing the hours paid (excluding overtime) for all contribution-eligible employees. *Id.* ¶ 11. If an employer fails to submit contributions by the due date, the Collection Policy allows the Fund to collect interest on the delinquent contributions at 10% per annum, or to collect liquidated damages equal to 20% of the delinquent contributions, whichever is greater. *Id.* ¶ 12–13 (citing Pls.' Mot. for Summ. J. Ex. 3 §§ 5.1, 5.2). If the Fund does not receive a remittance report for a given period and thus cannot determine the contributions owed, it can estimate them using the contributions from the

most recent period and consider the employer delinquent for that amount. *Id.* ¶ 14; *see also* Pls.' Mot. for Summ. J. Ex. 3 § 2. Further, the Collection Policy provides for the assessment of attorneys' fees and costs against a delinquent employer. Smith Decl. ¶ 15 (citing Pls.' Mot. for Summ. J. Ex. 3 § 5.3–5.4).

### B. The Rehabilitation Plan

From 2009 to 2017, the Fund was determined to be in "critical status" under the Pension Protection Act of 2006 (PPA), Pub. L. 109-280, 120 Stat. 780 (codified as amended in scattered sections of 26 and 29 U.S.C.),[1] and the Fund notified participating employers of that determination each year. Smith Decl. ¶ 17; Pls.' Mot. for Summ. J. Ex. 4, Dkt. 11-8 (critical status letters). Pursuant to the PPA, the Fund established a "Rehabilitation Plan" and notified participating employers of that plan in 2009. Smith Decl. ¶ 18; Pls.' Mot. for Summ. J. Ex. 5, Dkt. 11-9 (letter to employers outlining Rehabilitation Plan). The Rehabilitation Plan required participating employers to pay certain "surcharges" and "supplemental contributions" on top of the "base contribution rate" normally applied to each dollar of contribution-eligible wages. Smith Decl. ¶¶ 19, 22–25.

An initial 5% surcharge applied as of June 1, 2009, and that surcharge rose to 10% as of January 1, 2010. *Id.* ¶ 19. Under the Rehabilitation Plan, this 10% surcharge remained effective until replaced by a supplemental contribution schedule agreed to in a Collective Bargaining Agreement. *Id.* When the defendant negotiated its Collective Bargaining Agreement in 2010, it elected the "Preferred Schedule" of supplemental contributions, which when added to the 2009 and 2010 surcharges led to the following schedule:

---

[1] Under federal pension law, a plan will generally be considered in "critical status" if its funding falls below certain statutory requirements. *See generally* 26 U.S.C. § 432.

- 5% as of June 1, 2009
- 10% as of January 1, 2010
- 18.5% as of April 1, 2011
- 27.7% as of April 1, 2012
- 37.6% as of April 1, 2013
- 48.3% as of April 1, 2014
- 59.8% as of April 1, 2015
- 72.1% as of April 1, 2016
- 85.5% as of April 1, 2017

*Id.* ¶¶ 19–21 (citing Pls.' Mot. for Summ. J. Ex. 5). The Rehabilitation Plan applied the relevant surcharge or supplemental contribution rate to the defendant's 2% base contribution rate, such that the total contribution rate for 2010 would equal 2.2% (2% plus 10% surcharge, or .02 x 1.1), the total contribution rate beginning April 2011 would equal 2.37% (2% plus 18.5% supplemental contribution, or .02 x 1.185), and so forth. *Id.* ¶¶ 22–23 (citing Pls.' Mot. for Summ. J. Ex. 1, Art. 25.3).

### C. Delinquent Contributions

Based on these rates and the defendant's own remittance reports, the Fund's Contribution Compliance Manager, Kisha Smith, found the defendant delinquent with respect to three categories of employees, classified by "[s]ite number." *Id.* ¶ 1, 26–27. To illustrate the precise contributions due, she prepared detailed spreadsheets that list for each month: (1) the hours reported by the defendant (that is, the self-reported total gross monthly earnings of all covered employees); (2) the base contribution rate; (3) the base contributions due; (4) the supplemental rate; (5) the supplemental contributions due; (6) the total contributions due; (7) the amount paid

4

by the defendant; (8) the overpayment/underpayment, if any; (9) any applicable interest or liquidated damages due;[2] and (10) the total amount due. *See id.* ¶¶ 27–33; *see also id.* Exs. A, B, C (spreadsheets). These spreadsheets indicate that the defendant owes contributions, interest, and/or liquidated damages totaling:

- $13,151.85 for Site 2362 (dietary and housekeeping employees)[3]
- $27,007.94 for Site 2814 (certified nurse assistants)
- $1,432.18 for Site 2824 (recreational employees)

*See* Smith Decl. ¶¶ 30–36; *see also id.* Exs. A, B, C. These delinquent contributions are based purely on the defendant's self-reported wages. *Id*. ¶¶ 28–29, 37.

**D.    Audit Amounts**

Separately from these calculations, the Fund performed two random audits of the defendant's participation in the plan, in accordance with the Trust Agreement. *Id.* ¶¶ 38–41. Unlike the calculations described above—which take the defendant's reported hours and wages as a given—the audits were designed to determine whether the defendant accurately reported the number of hours or wages to begin with. *Id.* ¶ 40. Thus, the delinquent contribution calculations measured the outputs (the results of multiplying the reported wages by the applicable rates), while the audits measured the inputs (the reported wages themselves).

The first audit, conducted in 2015, focused on the years 2009 and 2010 and revealed that for Site 2362 the defendant owes $2,546.91 in unpaid contributions, $1,535.78 in interest

---

[2] The interest and liquidated damages figures are broken down further, but the Court consolidates them here for simplicity.

[3] Because the defendant failed to submit the required remittance reports for May and June of 2016, the Fund calculated the amount of delinquent contributions for those months using the hours reported for April 2016, in accordance with the Collection Policy. Smith Decl. ¶ 30; *see also* Pls.' Mot. for Summ. J. Ex. 3, § 2.

5

(through October 15, 2015), $127.35 in liquidated damages, $80.98 in PPA supplemental contributions, and $3,766.52 in audit testing fees, minus an overpayment of $1,207.98, for a total of $6,842.30 due, with interest accruing at $.70 per day. *Id.* ¶¶ 41–42; *see also* Pls.' Mot. for Summ. J. Ex. 6, Dkt. 11-10 (audit paperwork).

The second audit, conducted in 2016 and focused on years 2013 and 2014, revealed that for Site 2814 the defendant owes $7,777.94 in unpaid contributions, $3,223.32 in interest (through August 20, 2016), $545.24 in liquidated damages, $2,690.48 in PPA supplemental contributions, and $3,403.20 in audit testing fees, minus an overpayment of $1,041.78 and a partial payment of $9,034.46, for a total of $7,563.94 due, with interest accruing at $2.99 per day. Smith Decl. ¶¶ 43–44; *see also* Pls.' Mot. for Summ. J. Ex. 7, Dkt. 11-11 (audit paperwork). The same audit revealed that for Site 2824 the defendant owed $202.85 in unpaid contributions, $81.88 in interest (through August 20, 2016), $50.00 in liquidated damages, and $31.77 in PPA supplemental contributions, minus an overpayment of $114.53 and a partial payment of $148.08, for a total of $103.89 due, with interest accruing at $.08 per day. Smith Decl. ¶ 45; *see also* Pls.' Mot. for Summ. J. Ex. 7.

### E. The Parties' Submissions

To support the obligations and calculations outlined above, the plaintiffs have submitted a declaration from Contribution Compliance Manager Kisha Smith, who "maintain[s] the Fund's records, determine[s] whether participating employers have satisfied their obligations to make timely contributions to the Fund, and assist[s] in efforts to collect delinquent contributions from participating employers." Smith Decl. ¶ 2. They have also submitted copies of the Collective Bargaining Agreement, Trust Agreement, Collection Policy, Rehabilitation Plan, and 2015 and 2016 audits—each authenticated by Smith—and spreadsheets summarizing the Fund's

calculations in the manner described above. Pls.' Mot. for Summ. J. Exs. 1–7; Smith Decl. Exs. A, B, C.

The defendant for the most part responds by asserting insufficient information, characterizing the plaintiffs' proposed undisputed facts as "conclusions of law," and claiming that the referenced documents speak for themselves. *See generally* Def.'s Resp. to Pls.' Statement of Facts. In terms of actual evidence, the defendant offers a declaration from its counsel, David Jasinski, Dkt. 15-3, a copy of the Collective Bargaining Agreement, Dkt. 15-4, and a copy of a settlement agreement between various healthcare centers and a union, Dkt. 15-5. The Jasinski declaration asserts that the plaintiffs' submissions fail to specify the eligibility criteria applied by the Fund in calculating the contribution amounts owed. Jasinski Decl. ¶¶ 6–7. It explains that the defendant "[a]ppl[ied] all of the eligibility and other criteria" each month and then submitted remittance reports and contributions based on those amounts. *Id.* ¶¶ 13–14. Because those amounts were based on the correct eligibility criteria, the affidavit concludes, the delinquencies identified by the plaintiffs must have resulted from the Fund improperly including (1) wages paid to employees who had not yet been employed for at least ninety days; and (2) overtime pay—both of which are ineligible for contributions under the terms of the Collective Bargaining Agreement. *Id.* ¶¶ 8–16. Finally, the affidavit asserts that the attached settlement agreement—authenticated by Jasinski—bars recovery of any contribution amounts from September 2002 to March 2010. *Id.* ¶¶ 17–18.

### F. Procedural History

The plaintiffs filed this suit August 17, 2017, Dkt. 1, and the defendant answered on September 29, 2017, Dkt. 5. On November 6, 2017, before any discovery, the plaintiffs moved

7

for summary judgment.[4] The plaintiffs bring count I to recover amounts owed pursuant to the two audits, Compl. ¶¶ 20–29, count II to compel the defendant to submit missing reports from May 2016 and June 2016, *id.* ¶¶ 30–37, and count III to recover delinquent contributions, *id.* ¶¶ 38–47. For relief, the plaintiffs seek (1) $14,511.13 for the audit amounts; (2) $41,591.97[5] for the delinquent contributions; (3) attorneys' fees and costs; and (4) a permanent injunction requiring the defendant to remit reports and contributions to the Fund in a timely manner going forward. *Id.* at 13–14. And they ask the Court to retain jurisdiction of the case pending compliance with its orders. *Id.* at 14.

## II. LEGAL STANDARD

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). In response to a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "[T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis added in original). "Where the record taken as a whole could not lead a rational trier of fact to

---

[4] This case was reassigned to the undersigned on December 5, 2017.

[5] The complaint requests one penny more, but $41,591.97 reflects the amount requested in the plaintiffs' proposed order and the sums listed in the Smith declaration. *Compare* Compl. at 13 ($41,591.98), *with* Pls.' Proposed Order, Dkt. 11-4 ($41,591.97), *and* Smith Decl. ¶¶ 30–36, Exs. A, B, C (listing sums totaling $41,591.97).

8

find for the non-moving party, there is no genuine issue for trial." *Id.* (internal quotation marks omitted).

## III. ANALYSIS

The defendant argues that summary judgment is premature, that the plaintiffs have failed to provide a reasonable basis for determining damages, that any claims for contributions from 2009 to March 2010 are barred by a settlement agreement, and that the plaintiffs have not shown irreparable harm sufficient to justify a permanent injunction. Def.'s Opp'n at 3–7, Dkt. 15. The Court addresses each argument in turn.

### A. Summary Judgment Is Not Premature

Although the defendant does not invoke Rule 56(d) by name, that rule allows a non-movant to challenge summary judgment before discovery as premature, and the Court considers the defendant's objection to the timing of the plaintiffs' motion under that standard.

Rule 56(d) allows the court to deny or defer considering a motion for summary judgment if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. Proc. 56(d). The D.C. Circuit has interpreted Rule 56(d)—formerly Rule 56(f)[6]—to require an "affidavit" that "satisf[ies] three criteria." *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). The affidavit must (1) "outline the particular facts [the non-movant] intends to discover and describe why those facts are necessary to the litigation"; (2) "explain why [the non-movant] could not produce the facts in opposition to the motion for summary judgment"; and (3) "show the information is in fact discoverable." *Id.* at 99–100 (internal alterations and quotation marks omitted).

---

[6] Although some of the D.C. Circuit's decisions discuss Rule 56(f), Rule 56(d) "carrie[d] forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

9

The Jasinki declaration submitted by the defendant does not meet any of those requirements, let alone all three. Although it asserts—correctly—that "[n]o discovery has been completed in this matter," Jaskinski Decl. ¶ 2, it does not specify any facts the defendant intends to discover, nor does it describe why those facts are necessary, *see Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Castle Hill Health Care Providers, LLC*, 312 F.R.D. 678, 685 (D.D.C. 2015) (rejecting Rule 56(d) request where affidavit from Jasinski did not "identify the types of documents that Defendants would seek from Plaintiffs" or "identify any persons whom Defendants would attempt to depose"). The affidavit characterizes the plaintiff's submissions as conclusory and incomplete, but it does not point to any additional information or documents that might aid the defendant in responding to those submissions. *See* Jasinki Decl. ¶¶ 3–12; *see also Castle Hill Health Care Providers*, 312 F.R.D. at 685 (rejecting Rule 56(d) request where declaration "professed uncertainty and confusion" in response to "Plaintiff's summary spreadsheet" but failed to explain "*what facts* [the defendants] hope[d] to obtain in discovery that would enable them to dispute Plaintiffs' calculations").

Further, the declaration offers no explanation for why the defendant has not been able to produce certain materials, or that they would be discoverable. The Fund claims to have based its delinquency calculations on the defendant's self-reported hours, and its audit on the defendant's own documents. Smith Decl. ¶¶ 28–29, 38, 41, 43. Yet the Jasinski declaration does not explain how information necessary to rebut the plaintiffs' claims could be anywhere other than in the defendant's possession. *See Castle Hill Health Care Providers*, 312 F.R.D. at 685 (rejecting Rule 56(d) request where "it [wa]s not at all clear from the Jasinski Declaration why Defendants d[id] not already possess the records needed" and observing that the defendants already "possess[ed] information regarding the monthly amounts due to the Pension Fund and the actual

amounts paid" and that "the percentages used to calculate interest and liquidated, as reflected in the [plaintiffs'] spreadsheet, [we]re set forth in the relevant agreements").

Because the defendant does not "specify the types of documents [it] need[s] *from Plaintiffs* to appropriately defend this case" and "ha[s] failed to explain what discovery [it] seek[s] to obtain from Plaintiffs that is not duplicative of records already in [its] possession," *id.* (internal quotation marks omitted), the defendant has failed to meet the *Convertino* factors, and summary judgment is not premature.

### B. The Plaintiffs Provided a Reasonable Basis for Determining Damages

The plaintiffs describe the defendant as conceding liability on the merits but contesting damages. Pls.' Reply at 16–17, Dkt. 16. The difference between the merits and damages may in this case be a mirage, however, because the sole question is whether the defendant fulfilled its monetary obligations or not. That said, the Court agrees that the defendant has made no argument that it is not bound by the terms of the Collective Bargaining Agreement, the Rehabilitation Plan, or the Collection Plan and thus concedes its potential liability under those agreements. The Court will therefore focus, as the defendant does, on the purported amounts due.[7]

---

[7] The plaintiffs initially also challenged the defendant's failure to submit reports for the months of May 2016 and June 2016 and sought an order requiring the defendant to submit those reports and to pay contributions, interest, liquidated damages, and PPA supplemental contributions based on the amounts reported. Compl. at 10–11, 13–14. As Smith's declaration explains, however, the Collection Plan already provides for missing reports by allowing the Plan to use the amounts from the most recent month—here, April 2016—to calculate the delinquency for the missing periods. Smith Decl. ¶ 14. The Fund has done so here and used the April amounts for May and June in its calculations. *Id.* ¶ 30. Thus, the Court will treat count II as incorporated into count III and the total damages figure requested.

1. Audit Amounts

Although the defendant generally contends that a "reasonable basis . . . does not exist" for determining damages, Def.'s Opp'n at 3, it does not distinguish between the plaintiffs' proposed audit amounts and delinquent contributions—which involve different claims for distinct sums. Despite this ambiguity, even a generous reading of the defendant's opposition reveals that the substance of the defendant's objections focuses exclusively on delinquent contributions. *See id.* at 4–5. Indeed, in the defendant's chief attack on the plaintiffs' proposed damages—that the Fund incorrectly applied eligibility criteria—it specifically contrasts the delinquency calculations and the audit amounts and concedes that the audits do specify how the Fund determines eligibility. *See id.* at 5 ("Except for the few audit documents provided as Exhibits 6 and 7 to Plaintiffs' Motion for Summary Judgment, none of the documents provided by Plaintiffs indicate how the Pension Fund determines whether or not a particular person has met this threshold." (citing Jasinski Decl. ¶ 9)). The defendant has therefore failed to mount any specific challenge to the results of the Fund's audits, dooming any opposition to the plaintiffs' audit claims. *See Md. Elec. Indus. Health Fund v. MESCO, Inc.*, No. 12-cv-505, 2014 WL 853237, at *14 (D. Md. Feb. 28, 2014) ("Where a benefit fund has conducted an audit and no other barriers to liability or damages exist, judgment is appropriate, absent some specific challenge to the audit's findings."); *Nat'l Elec. Benefit Fund v. Rabey Elec. Co.*, No. 11-cv-184, 2012 WL 3854932, at *4 (D. Md. Sept. 4, 2012) ("[C]ourts have held that judgment as a matter of law is appropriate where the plan presents an audit demonstrating that contributions are owed and the employer fails to identify specific errors in the audit or provide documentation to rebut the audit's conclusions."). Because the defendants have not presented a material and genuine dispute concerning the plaintiffs' damages figure arising from its audits in 2015 and 2016, the Fund may collect the

amounts due under those audits unless any recovery is barred by the settlement agreement, which the Court addresses below.

    2.    Delinquent Contributions

As the plaintiffs point out, courts have previously awarded summary judgment for delinquent contributions based on declarations and spreadsheets strikingly similar to those offered here. *See, e.g.*, *Castle Hill Health Care Providers*, 312 F.R.D. at 682, 685 (finding plaintiffs met their burden at summary judgment by offering declaration from Contribution Compliance Manager that "summarize[d] the parties' contractual obligations under the various agreements," "set[] forth the dates and amounts of [the defendant's] delinquencies," and included "a spreadsheet showing, for each of the three sites, the 'Total Due Per Month,' the 'Amount Paid,' and 'Contributions Due,'" and "a monthly breakdown of the interest and liquidated damages on late paid contributions"); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr., Inc.*, 191 F. Supp. 3d 13, 18–20 (D.D.C. 2016) (granting summary judgment based on Contribution Compliance Manager's declaration and spreadsheets summarizing amounts owed); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Bristol Manor Healthcare Ctr., Inc.*, 153 F. Supp. 3d 363, 375 (D.D.C. 2016) (granting summary judgment based on Contribution Compliance Manager's declaration and spreadsheets and finding the defendant's "rebuttal evidence . . . wholly inadequate" because the defendant "ha[d] not produced its own estimate for the appropriate amount of damages" or "produced a version a of Plaintiffs' spreadsheets that [the defendant] claim[ed] [wa]s accurate"). Despite this authority,

the defendant raises three challenges to the plaintiffs' submissions—all based on the declaration of its attorney, Jasinski.[8]

First, the defendant argues that the plaintiffs have failed to "provide a conclusive figure or a defined methodology as to how the Pension Fund calculated the alleged amounts owed." Def.'s Opp'n at 4; Jasinski Dec. ¶ 3. But that argument has been flatly rejected by another judge on this court in nearly identical circumstances. *See Harborview Healthcare Ctr., Inc.*, 191 F. Supp. 3d at 18 (rejecting as not "well-founded" the argument that a Contribution Compliance Manager's "Declaration and attached spreadsheets [we]re inadequate support for plaintiffs' damages calculation because they fail[ed] to 'provide a conclusive figure or a defined methodology as to how the Pension Fund calculated the alleged amounts owed'" (quoting the defendant's opposition)).

Second, the defendant faults the plaintiffs for failing to "provide any sort of specific support documenting the gross, monthly payroll numbers used to calculate each month's" contributions and for failing to provide a "breakdown or explanation supporting the large amounts of liquidated damages claimed." Def.'s Opp'n at 4. As a result of these purported failings, the defendant accuses the plaintiffs of "summarily stat[ing] the amounts that they

---

[8] The Court notes that declarations from counsel must be confined to matters within the counsel's personal knowledge and must avoid mingling alleged facts with argument. *See, e.g.*, *Kelley v. Eli Lilly & Co.*, 517 F. Supp. 2d 99, 104 (D.D.C. 2007) ("[A]ffidavits provided by attorneys not made on personal knowledge are not considered during the granting of summary judgment."); *Universal Film Exchanges, Inc. v. Walter Reade, Inc.*, 37 F.R.D. 4, 5 (S.D.N.Y. 1965) (describing as an "inherently unsound practice" counsel's "mingling in his affidavit alleged facts, comment, inference, argument and explanation"). Here, counsel asserts he is "fully familiar with the facts of this matter" but does not provide any foundation for that familiarity. Jasinski Decl. ¶ 1. And the facts asserted in Jasinski's declaration overlap significantly with the legal arguments raised in the defendant's opposition. In any event, the facts asserted in the declaration—even if fully credited—are insufficient to create a genuine, material dispute of fact, for the reasons described below.

believe they are owed." *Id.* But as other judges on this court have pointed out, summarizing is expressly authorized by Federal Rule of Evidence 1006. *Harborview Healthcare Ctr., Inc.*, 191 F. Supp. 3d at 18 (finding spreadsheets from Contribution Compliance Manager qualified as "admissible summaries of the voluminous underlying evidence which may be used to 'prove the content' of the underlying documents" (quoting Fed. R. Evid. 1006)); *Bristol Manor Healthcare Ctr., Inc.*, 153 F. Supp. 3d at 375 (dismissing the defendant's contention that the plaintiffs "summarily stat[ed] the amounts they believe are owed" because "Rule 1006 allows Plaintiffs to do so" (quoting the defendant's opposition)). In *Harborview Healthcare Center*, the court observed that the Contribution Compliance Manager's declaration "include[d] both the amounts that the Fund ha[d] calculated it [wa]s due from [the defendant] and a detailed explanation of how those amounts were calculated," and found that was more than enough to make the attached spreadsheets admissible under Rule 1006 and justify granting summary judgment for the plaintiffs. 191 F. Supp. 3d at 18. Here too, the Smith declaration includes the amounts that the Fund calculated are due from the defendant and provides a detailed explanation of how those amounts were calculated. *See* Smith Decl. ¶¶ 26–36. And, as in *Harborview Healthcare Center* and *Bristol Manor Healthcare Center*, the Court concludes that the spreadsheets reflecting those amounts and calculations qualify as admissible summaries of voluminous evidence under Rule 1006.

Third, the defendant argues that the plaintiffs' documents fail to specify what eligibility criteria the Fund applied when determining the contributions owed and whether overtime pay was properly excluded from its calculations. *See* Def.'s Opp'n at 5; *see also* Jasinski Decl. ¶¶ 6–12. But the Fund based its calculations on the hours reported by the defendant in its remittance reports. Pls.' Reply at 11; Smith Decl. ¶¶ 28–29. It was the defendant's responsibility to apply

the appropriate eligibility criteria and exclude overtime hours before submitting those hours to the Fund. Pls.' Reply at 11; Smith Decl. ¶¶ 28–29. And if the defendant mistakenly included ineligible employees or overtime hours in its submissions, it must point to those mistakes with specificity now to create a genuine dispute; it cannot simply assume that the Fund somehow introduced ineligible workers or overtime hours in its calculations. *See Harborview Healthcare Ctr., Inc.*, 191 F. Supp. 3d at 19 (rejecting defendant's suggestion "that plaintiffs may have erroneously included overtime hours or other ineligible hours" because "the spreadsheets [we]re based on defendant's remittance reports and thus include[d] only 'covered' hours"); *see also id.* at 19 & n.11 (concluding that "[the] defendant cannot avoid summary judgment simply by speculating that plaintiffs may have erroneously included ineligible hours without offering any evidentiary support for that contention" other than "[t]he declaration from defendant's attorney [Jasinski] stating that he believes such an error might have occurred").

The Court finds that nothing in the Jasinski declaration creates a material and genuine dispute of fact sufficient to defeat the plaintiffs' motion for summary judgment.[9]

---

[9] The defendant points to one case in which the court declined to grant summary judgment based on spreadsheets submitted by a Pension Fund. Def.'s Opp'n at 4 (citing *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Hamilton Park Health Care Ctr., Ltd.*, 2016 WL 183505 (D.D.C. Jan. 14, 2016)). But in that case, the court relied on specific flaws in the plaintiffs' calculations not present here. The court described the fund's offered spreadsheet as "a remarkably inscrutable and unhelpful document" because its "bottom-line assessment" was "disconnected from the other information presented" and "[n]one of the columns add[ed] up to any of the[] [total] figures." *Id.* at *2. But those flaws were unique to the spreadsheet presented in that case, as the court went out of its way to acknowledge. *Id.* at *1 ("In light of the narrow, fact-intensive, and case-specific manner in which it will deny this motion, the Court doubts an opinion will be of use to anyone other than these parties."). Here, the Court has no difficulty understanding how the figures presented by the Fund relate to one another and lead to the total amounts sought.

### C. The Settlement Agreement

The defendant argues that a Settlement Agreement dated September 20, 2010 bars the plaintiffs from recovering any contributions from January 2009 to March 2010. *See* Def.'s Opp'n at 6 (citing Jasinski Decl. Ex. B.). That agreement states:

> The $226,878.25 payment represents full settlement of all months in which the Pension Fund claims the Facilities . . . were delinquent in remitting Pension Fund contributions on behalf of bargaining unit employees during the period of September 2002 through March 2010 and the Pension Fund has agreed to accept this amount for the periods noted above in full and final settlement of these claimed deficiencies.

Jasinski Decl. Ex. B.

As an initial matter, the Fund was not itself a party to the agreement, which settled certain "unfair labor practice charges" between the defendant[10] and the 1199 SEIU United Healthcare Workers East union. *Id*. Moreover, as the plaintiffs point out, the agreement refers only to "delinquent" contributions, not amounts due pursuant to an audit. *Id*. The Collection Policy, however, draws a distinction between the two, and provides a separate collection procedure for each. Pls.' Reply at 14; *see also* Pls.' Mot. for Summ. J. Ex. 3, §§ 2, 4. Finally, the agreement is limited to "these claimed deficiencies"—that is, those claimed by the parties at the time of the settlement agreement. Jasinski Decl. Ex. B. It does not purport to cover amounts found to be due many years later as a result of an audit.

The plaintiffs do not seek delinquent contributions from the relevant time period; they seek only amounts due pursuant to a 2015 audit. Compl. ¶ 22. Because the Fund is not a party to the agreement, and because the agreement by its terms covers only "delinquent" contributions

---

[10] Although "Parkway Healthcare, LLC" was not a party to the agreement either, the plaintiffs explain that the defendant used do business as "Bristol Manor Healthcare Center," Smith Decl. ¶¶ 6, 47, which the defendant does not appear to dispute.

17

claimed in 2010, *see* Jasinski Decl. Ex. B, the Court finds that the plaintiffs may recover those amounts notwithstanding the Settlement Agreement.

### D.     Costs and Attorneys' Fees

ERISA provides for mandatory attorneys' fees and costs in any action "by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded." 29 U.S.C. § 1132(g)(2). This action qualifies, as it is brought to enforce the defendant's obligation under § 1145 "to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement." *Id.* § 1145. Therefore, the Court will—and must—award reasonable attorneys' fees and costs pursuant to § 1132(g)(2). The Court will direct the plaintiffs to file a petition for attorneys' fees and costs and will retain jurisdiction over this matter for the limited purpose of addressing that issue.

### E.     Permanent Injunction

"It is well-settled that economic loss alone will rarely constitute irreparable harm." *Naegele v. Albers*, 843 F. Supp. 2d 123, 129 (D.D.C. 2012) (citing *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C.Cir.1985)). "This is because economic injuries are generally reparable with monetary damages in the ordinary course of litigation." *Id.*

The plaintiffs argue that, in addition to the missing payments, they have suffered the harm of "continued need for litigation against a recalcitrant employer." Pls.' Reply at 16. Specifically, the plaintiffs argue that the defendant has failed to pay outstanding court judgments and has continually disregarded its duty to pay the supplemental contributions required by the Preferred Schedule in the Collective Bargaining Agreement, despite court findings recognizing its obligation to do so. *Id.* at 15. But the Court does not find these economic harms irreparable, particularly given the mandatory attorneys' fees and costs provided by 29 U.S.C. § 1132(g)(2).

And to the extent the defendant has failed to comply with other courts' judgments or orders, the plaintiffs have other avenues of relief available to them besides obtaining an injunction in this suit, such as filing a motion for civil contempt.  *See Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 37–38, 40 (D.D.C. 2010) (ordering defendant-employer to show cause after failing to comply with court order requiring it to submit to pension fund audit).  The Court will therefore deny the plaintiffs' request for injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court will grant the plaintiffs' motion for summary judgment in part and deny it in part.  A separate order accompanies this memorandum opinion.

*/s/ Dabney L. Friedrich*
DABNEY L. FRIEDRICH
United States District Judge

Date: September 30, 2018